STATE OF NORTH CAROLINA v. TRAVEN MARQUETTE LEE

NO. COA11-637

(Filed 17 January 2012)

**1. Assault—deadly weapon with intent to kill inflicting serious injury—variance with indictment—type of weapon**

The trial court did not err by denying defendant's motion to dismiss a charge of assault with a deadly weapon with intent to kill inflicting serious injury for a variance between the evidence and the indictment. The evidence showed that defendant used an AK-47 while the indictment alleged a handgun.

**2. Criminal Law—defendant in shackles at trial—jury instruction—no prejudice**

Under the circumstances of the case, the trial court's error in requiring defendant to remain in shackles during the trial was not fundamentally unfair and was therefore harmless. The trial court did not follow the well-established statutory or case law, but clearly and emphatically instructed the jury not to consider defendant's restraints in any manner, and defendant was able to obtain an acquittal on an attempted murder charge despite representing himself while in shackles. Furthermore, the evidence against defendant was overwhelming.

**3. Constitutional Law—speedy trial—State not willful or negligent—no prejudice**

The trial court did not violate defendant's constitutional right to a speedy trial where twenty-two months passed between arrest and trial but defendant made no showing that the delay was due to willful or negligent actions by the State and suffered no prejudice by the delay.

**4. Jury—jury instructions unanimous verdict—not coercive**

The trial court's reinstructions to the jury did not coerce the jury to return unanimous verdicts under the circumstances. The jury had not indicated that they were having any trouble reaching a unanimous verdict on any of the charges when the trial court inquired of their progress, and the trial court did not instruct them that they would stay until a unanimous verdict was reached but simply that they would stay longer that evening with a view toward reaching a unanimous verdict.

**5. Homicide—intent to kill—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss charges of assault with a deadly weapon with intent to kill inflicting serious injury and attempted first-degree murder where defendant challenged only the sufficiency of the evidence that he intended to kill the victim. Although defendant argued that the evidence showed that he shot at the victim only once, aiming below the waist, the circumstances presented by defendant's evidence demonstrated that defendant planned to shoot and kill the victim because of disrespect and a drug deal, and that defendant entered the victim's store and opened fire with a high-powered rifle.

**6. Robbery—attempted—sufficiency of evidence**

There was sufficient evidence of attempted robbery where defendant entered a store and said "give it up" before firing shots at the owner, and defendant stated after Miranda warnings that he could not take a loss on drugs, that he intended to get his money back from the victim, and that he had discussed robbing the victim with the individual who supplied him with the gun.

Appeal by defendant from judgments entered 3 November 2010 by Judge Cy A. Grant in Halifax County Superior Court. Heard in the Court of Appeals 10 November 2011.

*Attorney General Roy Cooper, by Special Deputy Attorney General Dorothy Powers, for the State.*

*Kimberly P. Hoppin for defendant appellant.*

McCULLOUGH, Judge.

On 3 November 2010, a jury found Traven Marquette Lee ("defendant") guilty of three charges: attempted first-degree murder, attempted robbery with a dangerous weapon, and assault with a deadly weapon with intent to kill inflicting serious injury ("AWD-WITKISI"). On appeal, defendant contends the trial court erred by (1) denying his motion to dismiss the charge of AWDWITKISI for a fatal variance between the indictment and the evidence introduced at trial; (2) denying his motion to remove his shackles while in front of the jury; (3) denying his motion to dismiss for violating his right to a speedy trial; (4) giving the jury a recess and telling the jury they must stay until they reached a unanimous verdict; and (5) denying his

motions to dismiss the charges for insufficiency of the evidence. We hold defendant received a fair trial free of prejudicial error.

## I. Background

On the night of 7 January 2009, Crystal Boswell ("Boswell") was working as a cashier at a convenience store called Nana's Quick Mart located in Roanoke Rapids, North Carolina. Boswell was sitting on a stool behind the counter near the cash register when defendant entered the store. Boswell had seen defendant around the area and knew him by name. Cecil Ransom ("Ransom") was also present at Nana's Quick Mart on the night of 7 January 2009 and was standing behind the counter waiting to speak with the store owner, Raed Sirhan ("Sirhan"), when defendant walked in the door. Ransom had known defendant for several years.

When defendant entered the store, he was carrying an AK-47 rifle. Defendant said "give it up" and began shooting. Boswell got on the ground, crawled under the counter, and heard defendant fire more than five shots. Ransom heard defendant say "give it up" and turned to see defendant begin firing the gun. Ransom dove into the store office behind Sirhan, who was sitting in his office chair. Ransom kicked the office door shut and noticed that Sirhan had been shot. Sirhan gave Ransom a gun that Sirhan kept in his desk and told Ransom not to "let them kill me." Ransom then returned fire through the closed office door. When the shooting stopped, Boswell saw Sirhan sitting in his office chair with his leg bleeding.

Edward Hawkins ("Hawkins") was also working at Nana's Quick Mart on the night of 7 January 2009. He had seen defendant on a few prior occasions in the area. Hawkins saw defendant enter the store carrying the AK-47 rifle, heard the words "give it up," and saw defendant begin to fire the gun. Hawkins then ran to the back of the store and into the store's beer cooler. Hawkins also saw a second armed man standing behind defendant. Once things were quiet, Hawkins came out of the cooler. Hawkins saw blood and holes in Sirhan's shirt and pants legs and called emergency services.

Deputy Christopher Scott ("Deputy Scott") with the Halifax County Sheriff's Office responded to the call and was the first officer to arrive at the scene. Deputy Scott found Sirhan sitting in his office chair with two gunshot wounds in his thighs. Deputy Scott called for an ambulance, and Sirhan was taken to the hospital, where he underwent multiple surgeries in an attempt to repair the damage from gunshot wounds to both his right and left thighs as well as his left pelvis.

At the scene, Deputy Scott spoke with Boswell about the incident, and Ransom informed Deputy Scott that defendant was responsible for the shooting.

Deputy Jay Burch ("Deputy Burch") also responded to the call at Nana's Quick Mart and observed the crime scene. Deputy Burch observed multiple shell casings from both a high-powered rifle and a handgun around the front counter of the store. Lieutenant Bobby Martin ("Lieutenant Martin") photographed the scene inside the store and logged each piece of evidence. Inside Sirhan's office, Lieutenant Martin photographed blood spots and items that appeared to be pieces of flesh, as well as over $3,000 in cash lying on top of Sirhan's desk. Lieutenant Martin also collected the items of evidence from inside the store, including the money from Sirhan's desk, empty shell casings, blood and flesh material, and a .45 caliber handgun. After collecting the evidence and clearing the crime scene, the officers secured arrest warrants for defendant based on the statements given by the witnesses at the scene.

On 8 January 2009, defendant was arrested by Roanoke Rapids police officers and placed in the custody of Patrol Lieutenant Stevie Salmon ("Lieutenant Salmon") with the Halifax County Sheriff's Office. Defendant asked Lieutenant Salmon why he was being arrested, to which Lieutenant Salmon responded that defendant had outstanding warrants for attempted murder and armed robbery. While sitting handcuffed in the front seat of Lieutenant Salmon's patrol vehicle, defendant stated to Lieutenant Salmon that he had "tried to kill the mother f----- because he sold me some bad s---."

Within five minutes, Lieutenant Martin and Detective Sergeant Doug Pilgreen ("Detective Pilgreen") arrived and took defendant into their custody. Once the officers placed defendant in their patrol vehicle, Lieutenant Martin read defendant his *Miranda* rights and had defendant sign a statement that defendant had been so advised. During the car ride to the Sheriff's Office, defendant admitted to Lieutenant Martin that he had gone into the convenience store and shot at Sirhan. Defendant stated he only intended to kill Sirhan because Sirhan had shorted him on a drug deal. Lieutenant Martin reduced defendant's statement to writing and defendant signed the statement. Upon arriving at the sheriff's office, defendant gave a more detailed statement as to what had happened on the previous night. Defendant again stated that he had purchased "$5,000 worth of cocaine" from Sirhan, "but it was bad." Defendant stated he called Sirhan and asked for his money back, to which Sirhan responded that

defendant would "have to take an L on it." Defendant stated he "couldn't take an L" and that he "was going to get [his money] back any way [he] could," so he went to Sirhan's store with an AK-47 gun, saw Sirhan sitting in his office, and "started shooting."

On 10 January 2009, after being Mirandized and waiving his rights, defendant gave another statement to Detective Pilgreen. Defendant gave Detective Pilgreen the name of the individual who had supplied defendant with a car and the gun, as well as a detailed account of the events leading up to the shooting. Defendant again stated that Sirhan had sold him "some bad dope," that defendant told Sirhan he wanted his "money back or some more dope," and that "[he] went to the store to shoot [Sirhan]." Defendant also stated the individual supplying the gun sent his "men" to the store with defendant to rob Sirhan for drugs, "since defendant was going in there anyway."

On 15 January 2009, defendant gave a similar statement to Lieutenant Martin, providing names of the other individuals that accompanied defendant to Nana's Quick Mart on "the night of the robbery," including an individual who went into the store with defendant carrying another assault rifle, and stating that he "only wanted to settle with [Sirhan] over some bad dope." Defendant again gave a similar statement to Special Agent Harold McCluney, Jr. ("Special Agent McCluney") of the Bureau of Alcohol, Tobacco, and Firearms, stating that he had discussed robbing Sirhan's store with the individual supplying the gun and that he "wanted to shoot [Sirhan] because [Sirhan] had disrespected him regarding the drugs and [Sirhan] wouldn't give him his money back."

Beginning on 1 November 2010, defendant was tried by a jury on charges of attempted first-degree murder of Sirhan, Boswell, and Ransom; attempted robbery with a dangerous weapon of Sirhan, Boswell, and Ransom; and AWDWITKISI of Sirhan. Defendant represented himself at trial, with standby counsel. At the close of the evidence, the trial court dismissed the charges of attempted murder and attempted robbery of Boswell, dismissed the charge of attempted robbery of Ransom, and submitted the remaining charges to the jury. The jury returned verdicts of guilty on the charges of attempted first-degree murder, attempted robbery with a dangerous weapon, and AWDWITKISI on Sirhan. The jury returned a verdict of not guilty on the charge of attempted first-degree murder of Ransom.

On 3 November 2010, the trial court entered judgments on the verdicts, sentencing defendant to a term of 220 to 273 months' impris-

onment for the attempted first-degree murder conviction, a consecutive term of 116 to 149 months' imprisonment for the AWDWITKISI conviction, and a consecutive term of 103 to 133 months' imprisonment for the charge of attempted robbery with a dangerous weapon. Defendant gave oral notice of appeal in open court at the close of trial.

## II. Motion to dismiss for fatal variance

[1] Defendant first contends the trial court erred in denying his motion to dismiss the AWDWITKISI charge. Defendant argues he was entitled to dismissal of this charge because of a fatal variance between the indictment and the evidence produced at trial.

"It is the settled rule that the evidence in a criminal case must correspond with the allegations of the indictment which are essential and material to charge the offense." *State v. McDowell*, 1 N.C. App. 361, 365, 161 S.E.2d 769, 771 (1968). " 'A variance occurs where the allegations in an indictment, although they may be sufficiently specific on their face, do not conform to the evidence actually established at trial.' " *State v. Skinner*, 162 N.C. App. 434, 445, 590 S.E.2d 876, 885 (2004) (quoting *State v. Norman*, 149 N.C. App. 588, 594, 562 S.E.2d 453, 457 (2002)). "In order for a variance to warrant reversal, the variance must be material. A variance is not material, and is therefore not fatal, if it does not involve an essential element of the crime charged." *Id.* at 445-46, 590 S.E.2d at 885 (citations omitted).

The essential elements of the crime of AWDWITKISI are "(1) an assault, (2) with a deadly weapon, (3) with intent to kill, (4) inflicting serious injury, and (5) not resulting in death." *Id.* at 445, 590 S.E.2d at 885. In *State v. Ryder*, 196 N.C. App. 56, 674 S.E.2d 805 (2009), this Court noted the well-settled rule that "[w]hen an indictment charges a crime that requires the use of a deadly weapon, the State is required to ' "(1) name the weapon and (2) either to state expressly that the weapon used was a 'deadly weapon' or to allege such facts as would *necessarily* demonstrate the deadly character of the weapon." ' " *Id.* at 65-66, 674 S.E.2d at 812 (quoting *State v. Brinson*, 337 N.C. 764, 768, 448 S.E.2d 822, 824 (1994) (quoting *State v. Palmer*, 293 N.C. 633, 639-40, 239 S.E.2d 406, 411 (1977))). Further, this Court stated that "[t]he State cannot, on appeal, change the identity of the dangerous weapon from that specified in the indictment in order to support the conviction." *Id.* at 66, 674 S.E.2d at 812.

In the present case, defendant argues the evidence produced at trial unequivocally established that defendant used an AK-47 rifle to

commit the offense, which is inconsistent with the allegation in the indictment that defendant used a handgun to commit the offense. Relying on the language in *Ryder*, defendant argues that because the State changed the identity of the dangerous weapon, his conviction for AWDWITKISI should be vacated. However, we fail to see how the difference here is material, as both a handgun and an AK-47 rifle are a type of gun, are obviously dangerous weapons, and carry the same legal significance. *Cf. Skinner*, 162 N.C. App. at 446, 590 S.E.2d at 885 (holding a fatal variance existed where indictment alleged deadly weapon used by the defendant was his hands, but evidence at trial established that deadly weapon used by the defendant was "a hammer or some sort of iron pipe"); *Ryder*, 196 N.C. App. at 65-66, 674 S.E.2d at 812 (holding the State could not support robbery with a dangerous weapon conviction with argument that a car was the dangerous weapon used by the defendant, where the indictment alleged the defendant used a "firearm" to perpetrate the robbery). Had the indictment simply specified that defendant used a "gun" to commit the offense, the indictment would have been sufficient to give notice to defendant of the allegation that he used some type of gun to commit the assault. *See Skinner*, 162 N.C. App. at 445, 590 S.E.2d at 884-85 ("An indictment need only allege the ultimate facts constituting each element of the criminal offense. Evidentiary matters need not be alleged.").

Moreover, defendant has not demonstrated, nor does he argue, that any prejudice resulted from the difference in the gun alleged in the indictment and the gun established at trial. *See State v. Weaver*, 123 N.C. App. 276, 291, 473 S.E.2d 362, 371 (1996) ("In general, a variance between the indictment and the proof at trial does not require reversal unless the defendant is prejudiced as a result. This Court has required that a defendant demonstrate that he or she was misled by a variance, or hampered in his/her defense before this Court will consider the variance error." (citation omitted)). Defendant's argument on this issue is therefore without merit.

### III.  Motion to remove shackles in presence of jury

[2] Defendant's second contention is that the trial court erred in denying his motion to remove the shackles from his ankles while he was in the presence of the jury. Defendant argues the trial court violated the statutory provisions of N.C. Gen. Stat. § 15A-1031 (2009), as well as his right to due process. In reviewing the propriety of physical restraints in a particular case, "the test on appeal is whether, under

all of the circumstances, the trial court abused its discretion." *State v. Tolley*, 290 N.C. 349, 369, 226 S.E.2d 353, 369 (1976).

In *Tolley*, our Supreme Court established that "there has evolved the general rule that a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary instances." *Id.* at 365, 226 S.E.2d at 366.

> The reasons being: (1) it may interfere with the defendant's thought processes and ease of communication with counsel; (2) it intrinsically gives affront to the dignity of the trial process,.and most importantly; (3) it tends to create prejudice in the minds of the jurors by suggesting that the defendant is an obviously bad and dangerous person whose guilt is a foregone conclusion.

*State v. Jackson*, 162 N.C. App. 695, 700, 592 S.E.2d 575, 578 (2004).

Nonetheless, "the rule against shackling is subject to the exception that the trial judge, in the exercise of his sound discretion, may require the accused to be shackled when such action is necessary to prevent escape, to protect others in the courtroom or to maintain order during trial." *Tolley*, 290 N.C. at 367, 226 S.E.2d at 367; *see also* N.C. Gen. Stat. § 15A-1031. *Tolley* enumerates a non-exhaustive list of twelve material circumstances a trial judge should consider in determining whether to shackle a defendant:

> [T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*Tolley*, 290 N.C. at 368, 226 S.E.2d at 368.

Both *Tolley* and N.C. Gen. Stat. § 15A-1031 set forth the proper procedure a trial judge should follow when ordering a defendant to remain shackled during trial. The trial judge must state for the record, out of the presence of the jury and in the presence of the defendant, the particular reasons for the judge's decision and give the defendant an opportunity to voice objections and persuade the court that such measures are unnecessary. *Tolley*, 290 N.C. at 368, 226 S.E.2d at 368;

N.C. Gen. Stat. § 15A-1031. Indeed, this Court has emphasized that "[s]hould the trial judge, in his sound discretion, decide shackling is a necessary means for a safe and orderly trial in his or her courtroom, the determination *must* be supported by adequate findings." *Jackson*, 162 N.C. App. at 700, 592 S.E.2d at 578 (emphasis added). When the need for physical restraints is controverted by the defendant, the trial judge should conduct a full evidentiary hearing and make formal findings of fact. *Tolley*, 290 N.C. at 368, 226 S.E.2d at 368; N.C. Gen. Stat. § 15A-1031. "In any event, a record must be made which reflects the reasons for the action taken by the court and which indicates that counsel have been afforded an opportunity to controvert these reasons and thrash out any resulting factual questions." *Tolley*, 290 N.C. at 368-69, 226 S.E.2d at 368. This Court has previously "caution[ed] trial courts to adhere to the proper use of their discretion and provide the rationale for that discretion, via some finding substantiated in the record." *Jackson*, 162 N.C. App. at 701, 592 S.E.2d at 579. Moreover:

> Once the decision to shackle the defendant during trial has been made by the trial court in this fashion, . . . the judge should . . . instruct the jury in the clearest and most emphatic terms that it give such restraint no consideration whatever in assessing the proofs and determining guilt. *This is the least that can be done toward insuring a fair trial.*

*Tolley*, 290 N.C. at 369, 226 S.E.2d at 368 (emphasis added) (internal quotation marks and citation omitted); *see also* N.C. Gen. Stat. § 15A-1031.

In the present case, after the jury had been impaneled but before the State had called its first witness, defendant made a motion to the trial court to remove his shackles while he was in the presence of the jury. The trial court simply responded that defendant's motion "is denied," without providing any further elaboration. Thereafter, the State proceeded to call its first witness until the trial was recessed for the evening. On the following morning, before the jury was brought back into the courtroom, the trial court inquired of the bailiff whether defendant was "still wearing the leg chains." The bailiff informed the trial court that defendant was still wearing leg chains because it was "policy." The trial court then brought the jury back in and proceeded to instruct the jury that defendant was wearing "leg irons . . . because it is standard policy with the jail." The trial court then proceeded to give the following instruction to the jury:

Mr. Lee has not been convicted of a crime. He is not serving a sentence of any type. It is simply that he has not been able to make bond on these charges, and he is being held in custody because he was financially not able to make bond. It is standard policy of the sheriff's department here or the jail that when a person is brought into the courtroom, he has to have the leg chains' on.

The trial court then instructed the jury:

[The shackles are] "no evidence whatsoever that [defendant] is guilty of anything or that he is being treated any differently or that he is more dangerous than anybody else, it is simply standard policy that a person who has not been able to make bond who is being held in custody and is brought into the courtroom has to have on leg chains.

Thus, it appears from the record that the trial court's sole reason for denying defendant's request to remove his shackles during trial was that defendant was financially unable to make bond and therefore required to remain in shackles pursuant to jail policy.

The trial court clearly did not follow the well-established law on this issue: the statutory procedures were not complied with, nor can we determine from the record that the trial judge considered any of the material factors enumerated in our case law in making his determination. In addition, the trial court did not provide defendant any explanation outside the presence of the jury for why it was requiring defendant to remain in shackles during the trial, nor did the trial court state any findings in the record to support the determination. Ordinarily, requiring defendant to remain in shackles during trial in the presence of the jury under these conditions is inherently prejudicial under our case law. *See Tolley*, 290 N.C. at 366, 226 S.E.2d at 367 ("[I]n the absence of a showing of necessity therefor, compelling the defendant to stand trial while shackled is inherently prejudicial in that it so infringes upon the presumption of innocence that it interfere[s] with a fair and just decision of the question of . . . guilt or innocence." (alterations in original) (internal quotation marks and citations omitted)).

However, under the particular circumstances of this case, we conclude the trial court's error in requiring defendant to remain in shackles during the trial of his case was not fundamentally unfair and was therefore harmless. Notably, the trial court clearly and emphatically instructed the jury not to consider defendant's restraints in any manner, and despite having to present his own defense while wearing

the shackles, defendant was still able to obtain an acquittal on one of the attempted murder charges against him. Furthermore, given the overwhelming evidence against defendant, including his own Mirandized statements, we fail to see how defendant's shackling contributed to his convictions in the present case. Nevertheless, we again strongly caution trial courts to adhere to the proper procedures regarding shackling of a defendant, as established by our Supreme Court in *Tolley* and our Legislature in section 15A-1031 of our General Statutes.

## IV. Motion to dismiss for speedy trial violation

**[3]** Defendant's next contention is that the trial court erred in denying his motion to dismiss the charges for violation of his constitutional right to a speedy trial. Both "the fundamental law of this state" and the Sixth and Fourteenth Amendments to the United States Constitution "guarantee those persons formally accused of crime the right to a speedy trial." *State v. Avery*, 302 N.C. 517, 521, 276 S.E.2d 699, 702 (1981). "[A] claim that a speedy trial has been denied must be subjected to a balancing test in which the court weighs the conduct of both the prosecution and the defendant." *State v. McKoy*, 294 N.C. 134, 140, 240 S.E.2d 383, 388 (1978). In determining whether a defendant's constitutional right to a speedy trial has been violated, our Courts consider the following four "interrelated" factors: "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to defendant resulting from the delay." *Avery*, 302 N.C. at 522, 276 S.E.2d at 702. "Thus the circumstances of each particular case must determine whether a speedy trial has been afforded or denied, and the burden is on an accused who asserts denial of a speedy trial to show that the delay was due to the neglect or willfulness of the prosecution." *McKoy*, 294 N.C. at 141, 240 S.E.2d at 388; *see also State v. Flowers*, 347 N.C. 1, 27, 489 S.E.2d 391, 406 (1997).

Here, defendant was arrested on 8 January 2009, and was tried by a jury on 1 November 2010. Thus, the length of time between defendant's arrest and trial was approximately twenty-two months. Our Supreme Court has observed that such a delay is "unusual." *McKoy*, 294 N.C. at 141, 240 S.E.2d at 388. Nonetheless, "we do not determine the right to a speedy trial by the calendar alone[.]" *Id.* (internal quotation marks and citation omitted). Rather, "we must consider the length of the delay in relation to the three remaining factors." *Id.*

STATE v. LEE

[218 N.C. App. 42 (2012)]

The second factor, the reason for the delay, appears to be a "mixed bag." Following defendant's indictments on 16 February 2009 and 13 April 2009, the trial court held a hearing on 14 April 2009 on defendant's bond motion. The trial court held another pretrial hearing on 27 May 2009 to [address defendant's dissatisfaction with his appointed counsel. At the 27 May hearing, the trial court appointed new counsel for defendant. On 28 July 2009, defendant appeared before the trial court for arraignment. Defendant entered pleas of not guilty as to all the charges against him and rejected all plea offers, and the trial court joined the charges for trial. At the close of the arraignment hearing, the record shows the trial court set the date for trial as 12 October 2009.

However, defendant's trial was continued so that defendant could undergo a court-ordered psychiatric evaluation. Defendant was evaluated by a forensic psychiatrist to determine his competency to stand trial on 13 November 2009. On 9 September 2010, nearly ten months after defendant's competency evaluation was completed, the trial court held a competency hearing. At the conclusion of the competency hearing, defendant's trial was scheduled for 1 November 2010, and defendant was ultimately tried on that date.

In his brief, defendant simply asserts that the State was responsible in part for the twenty-two-month delay by not calendaring his competency hearing until nearly ten months after he completed a competency evaluation. However, from the record before us, we are unable to determine precisely the reasons why nearly ten months elapsed before defendant's competency hearing was calendared. The record indicates that during this time, defendant filed numerous complaints with the State Bar concerning his appointed counsel and wrote the trial court on multiple occasions asking that his appointed counsel be removed from his case. The record further indicates that also during this time, Sirhan was out of the country receiving medical treatment for his injuries and was unavailable. While we are troubled by such a delay, given the actions by defendant concerning his appointed counsel and the availability of the victim, we cannot say the delay was due to any willfulness or negligence on the part of the State, especially in light of the fact that defendant has made no showing of such on appeal.

There is no dispute that defendant repeatedly attempted to assert his right to a speedy trial in this case. However, defendant has failed to show any actual and substantial prejudice resulting from the delay.

In addressing the prejudice factor in speedy trial violations, our Supreme Court has noted:

The right to a speedy trial is designed:

(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. *Of these, the most serious is the last*, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

*State v. Webster*, 337 N.C. 674, 680-81, 447 S.E.2d 349, 352 (1994) (internal quotation marks and citation omitted).

Here, defendant's sole contention is that the delay impaired his defense. Specifically, defendant contends that because of the delay, Sirhan was no longer available for trial, thereby denying defendant the opportunity to cross-examine Sirhan and elicit evidence that could be helpful for his defense. However, defendant does not state what possible evidence he could have obtained from Sirhan that would have been beneficial or significant to his defense. According to our Supreme Court, "[t]he defendant must show that the resulting lost evidence or testimony was significant and would have been beneficial to his defense." *State v. Marlow*, 310 N.C. 507, 521-22, 313 S.E.2d 532, 541 (1984). Furthermore, the fact that defendant had no opportunity to cross-examine Sirhan is inapposite, as the State neither presented Sirhan as a witness nor used Sirhan's testimony during trial. Thus, defendant has not met his burden of showing any actual or substantial prejudice resulting from the delay.

In light of these factors, although the length of time between defendant's arrest on these charges and his trial appears to be unusual, in light of the fact that defendant has made no showing that such a delay was due to the willful or negligent actions of the State and in light of the fact that defendant has shown no prejudice by the delay, we hold the trial court did not err in denying defendant's motions to dismiss for speedy trial violations.

### V.  Coerced jury verdicts

**[4]** Defendant's next contention is that the trial court's re-instructions to the jury coerced the jury to return unanimous verdicts in violation of Article I, Section 24 of the North Carolina Constitution.

In their recent opinion in *State v. Wilson*, 363 N.C. 478, 681 S.E.2d 325 (2009), our Supreme Court announced that "where the error vio-

lates the right to a unanimous jury verdict under Article I, Section 24, it is preserved for appeal without any action by counsel." *Id.* at 484, 681 S.E.2d at 330. This is so because "the right to a unanimous jury verdict is fundamental to our system of justice." *Id.* at 486, 681 S.E.2d at 331. The proper standard of review for an alleged error that violates a defendant's right to a unanimous jury verdict under Article I, Section 24, is harmless error, under which "[t]he State bears the burden of showing that the error was harmless beyond a reasonable doubt." *Id.* at 487, 681 S.E.2d at 331. " 'An error is harmless beyond a reasonable doubt if it did not contribute to the defendant's conviction.' " *Id.* (quoting *State v. Nelson*, 341 N.C. 695, 701, 462 S.E.2d 225, 228 (1995)).

"It is well settled that a trial judge has no right to coerce a verdict, and a charge which might reasonably be construed by a juror as requiring him to surrender his well-founded convictions or judgment to the views of the majority is erroneous." *State v. Blair*, 181 N.C. App. 236, 246, 638 S.E.2d 914, 921 (2007) (internal quotation marks and citations omitted). " '[I]t has long been the rule in this State that in deciding whether a court's instructions force a verdict or merely serve as a catalyst for further deliberations, an appellate court must consider the circumstances under which the instructions were made and the probable impact of the instructions on the jury.' " *State v. Fernandez*, 346 N.C. 1, 21, 484 S.E.2d 350, 362-63 (1997) (quoting *State v. Peek*, 313 N.C. 266, 271, 328 S.E.2d 249, 253 (1985)). Thus, in determining whether the trial court's actions are coercive, we must look to the totality of the circumstances. *State v. Beaver*, 322 N.C. 462, 464, 368 S.E.2d 607, 608 (1988).

In the present case, the jury retired to begin its deliberations at 3:38 p.m. on the third day of trial. At 5:51 p.m., the trial judge brought the jury back into the courtroom to inquire about the progress the jury had made. The jury indicated that, at that time, it had reached unanimous verdicts on two of the four charges. The trial judge then allowed a twenty-minute recess, giving the following challenged instruction:

What I am going to do at this point is allow you to take a recess for about 20 minutes[.]

If anyone needs during this 15 or 20 minute recess to call someone, a family member, to let them know that you are going to be delayed—but we are going to stay here this evening with a view towards reaching a unanimous verdict on the other two.

That's where we are. I want everyone to know that. If you need to call someone to let them know you will be delayed, that's fine.

After taking the recess, and answering a question asked by the jury, the trial judge sent the jury to resume its deliberations at 6:19 p.m. Eleven minutes later, at 6:30 p.m., the jury returned unanimous verdicts in all four cases.

Considering the totality of the circumstances of the present case, the trial court's instructions here were not coercive. Although it only took the jury eleven minutes to reach unanimous verdicts in all four cases following the challenged instruction by the trial court, the jury did not indicate they were having any trouble reaching a unanimous verdict on any of the charges when the trial court inquired of the jury's progress. At the time of the recess, the jury simply stated they had reached unanimous verdicts on two of the four charges. The possibility remains that the jury may have been close to reaching a verdict in the remaining two cases when the judge brought the jury back in. Further, although the trial court told the jury they would stay longer for further deliberations, the trial court did not instruct the jury that they would be required to stay until a unanimous verdict was reached on all charges. The trial court simply instructed the jury they would stay longer that evening "with a view towards reaching a unanimous verdict." After the instruction was given, the jury proceeded to ask the trial court a question, and no juror indicated that staying longer to deliberate would be a problem. Moreover, we fail to see how the trial court's instructions could have contributed to the convictions of defendant in light of the overwhelming evidence against defendant in this case. Thus, the trial court's instructions were not prejudicial error entitling defendant to a new trial.

## VI. Motions to dismiss for insufficiency of the evidence

[5] Defendant's final contention is that the trial court erred in denying his motions to dismiss the charges because the State presented insufficient evidence to support the convictions. "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (internal quotation marks and citations omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-

79, 265 S.E.2d 164, 169 (1980). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994). "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007).

The essential elements of an AWDWITKISI offense are: (1) an assault on another person, (2) with a deadly weapon, (3) with the intent to kill, (4) inflicting serious injury, and (5) not resulting in death. *State v. Wampler*, 145 N.C. App. 127, 130, 549 S.E.2d 563, 566 (2001); *see also State v. Reid*, 335 N.C. 647, 654, 440 S.E.2d 776, 780 (1994). Here, the State presented competent evidence at trial that defendant entered Sirhan's convenience store carrying an AK-47 rifle, a deadly weapon. Defendant intentionally fired shots into the office where Sirhan was sitting, and Sirhan was hit in the thighs by defendant's shots. Sirhan was seriously injured and was forced to undergo multiple surgeries to repair the damage caused by the shots defendant fired. Moreover, defendant admitted to Lieutenant Salmon and Lieutenant Martin that he intended to kill Sirhan because Sirhan had sold him bad drugs.

"A person commits the crime of attempted first degree murder if he: '(1) specifically intends to kill another person unlawfully; (2) he does an overt act calculated to carry out that intent, going beyond mere preparation; (3) he acts with malice, premeditation, and deliberation; and (4) he falls short of committing the murder.'" *State v. Jackson*, 189 N.C. App. 747, 753, 659 S.E.2d 73, 77-78 (2008) (quoting *State v. Cozart*, 131 N.C. App. 199, 202-03, 505 S.E.2d 906, 909 (1998)), *disc. review denied, appeal dismissed*, 362 N.C. 512, 668 S.E.2d 564 (2008), *cert. denied*, 555 U.S. 1215, 173 L. Ed. 2d 662 (2009). Here, again, the State presented competent evidence at trial that defendant admitted to Lieutenant Salmon and Lieutenant Martin that he intended to kill Sirhan because Sirhan had sold him bad drugs. Defendant's own statements indicated that he met with another individual to obtain a gun in order to carry out his plan. Defendant then went to Sirhan's convenience store carrying an AK-47 rifle and shot at Sirhan with the firearm multiple times, seriously injuring him.

With respect to these first two offenses, it appears that defendant only challenges the sufficiency of the evidence that he intended to kill Sirhan, despite the admission of his Mirandized statements to

Lieutenants Salmon and Martin. Although defendant argues that his statements to these two officers were the subject of his motion to suppress, defendant did not appeal the trial court's denial of that motion, and the statements were nevertheless entered into evidence. Although defendant acknowledges that he brought the firearm to the convenience store and intentionally shot at Sirhan, defendant argues the evidence shows only that he shot at Sirhan at least once, aiming below the waist, which is insufficient to establish an intent to kill. However, as defendant also acknowledges, " '[a]n intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances.' " *Wampler*, 145 N.C. App. at 130, 549 S.E.2d at 566 (alteration in original) (quoting *State v. Thacker*, 281 N.C. 447, 455, 189 S.E.2d 145, 150 (1972)). The circumstances presented by the State's evidence demonstrate that defendant planned to shoot and kill Sirhan because Sirhan had "disrespected" him and "shorted" him on a drug deal, and that defendant entered Sirhan's store and opened fire on Sirhan with a high-powered assault rifle. The evidence presented by the State was more than sufficient to support a reasonable conclusion that defendant intended to kill Sirhan.

[6] Finally, the elements of attempted robbery are: (1) the unlawful attempt to take any personal property from another; (2) possession, use or a threatened use of a firearm or other dangerous weapon, and (3) danger or threat to the life of the victim. *State v. Torbit*, 77 N.C. App. 816, 817, 336 S.E.2d 122, 123 (1985). Here, the State's evidence showed that defendant entered the store with an AK-47 rifle and said "give it up" before firing shots at Sirhan. The State also presented defendant's Mirandized statements that he couldn't take a loss on the drugs, that he intended to get his $5,000 back from Sirhan, and that he discussed robbing Sirhan with the individual who supplied defendant with the gun. This is sufficient evidence from which a jury could infer that defendant went to the store to rob Sirhan of the money he felt he was owed.

Accordingly, the State presented sufficient evidence of all three charges, such that the trial court properly submitted the charges to the jury and denied defendant's motions to dismiss.

### VII.  Conclusion

We hold the trial court did not err in denying defendant's motion to dismiss the AWDWITKISI charge for a fatal variance, as the differ-

**STATE v. LEE**

[218 N.C. App. 42 (2012)]

ence between a handgun and an AK-47 rifle is not material, and defendant has shown no prejudice resulting from the difference.

Second, we hold that although the trial court abused its discretion in ordering defendant to remain shackled during the pendency of his trial, the error was harmless in the present case in light of the trial court's curative instruction and the overwhelming evidence of defendant's guilt.

We further hold the trial court did not err in denying defendant's motions to dismiss for a speedy trial violation. Although the length of the delay between defendant's arrest and trial was unusual, defendant has shown neither that the delay was due to the neglect or willfulness of the State, nor that he suffered any actual and substantial prejudice from the delay.

We also hold that, under the totality of the circumstances of this case, the trial court's instruction to the jury that they should stay longer with a goal towards reaching a unanimous verdict on the remaining two charges was not coercive, especially in light of the overwhelming evidence of defendant's guilt.

Finally, we hold the trial court did not err in denying defendant's motions to dismiss for insufficiency of the evidence, as the State presented competent evidence as to each element of all three offenses and defendant's being the perpetrator of those offenses. Accordingly, we hold defendant received a fair trial free of prejudicial error.

No prejudicial error.

Judges HUNTER, JR., and THIGPEN concur.