An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-301

NORTH CAROLINA COURT OF APPEALS

Filed: 7 January 2014

STATE OF NORTH CAROLINA

v.

Robeson County
No. 08 CRS 53464

CHRISTOPHER LEE LOCKLEAR


Appeal by defendant from judgments entered 13 July 2012 by Judge James G. Bell in Robeson County Superior Court. Heard in the Court of Appeals 27 August 2013.

> *Attorney General Roy Cooper, by Special Deputy Attorney General John H. Watters, for the State.*

> *Appellate Defender Staples Hughes, by Assistant Appellate Defender Constance E. Widenhouse, for Defendant.*


ERVIN, Judge.


Defendant Christopher Lee Locklear appeals from judgments sentencing him to life imprisonment without the possibility of parole based upon his conviction for first degree murder and to 51 to 71 months imprisonment based upon his conviction for robbery with a dangerous weapon. On appeal, Defendant argues that the trial court committed prejudicial error by ordering that Defendant and his co-defendants wear "stun vests" operated

by uniformed officers seated behind them during the trial and by instructing the jury that evidence of Defendant's flight could be considered for the purpose of showing a consciousness of guilt on his part. After careful consideration of Defendant's challenges to the trial court's judgments in light of the record and the applicable law, we conclude that the trial court's judgments should remain undisturbed.

## I. Factual Background

## A. Substantive Facts

On 31 March 2008, Antonio Locklear went to the home of his cousin, Larry Wayne Locklear, for the purpose of purchasing marijuana. At the time, Mr. Locklear lived with his girlfriend, Jessica Cahoon, and her parents in Fayetteville, while Larry Wayne Locklear lived in a mobile home on Tonya Locklear Road in Robeson County. Mr. Locklear usually went to Robeson County every second or third day to buy marijuana from Larry Wayne Locklear for the purpose of resale.[1]

At approximately 8:00 p.m. on 31 March 2008, Ms. Cahoon drove Mr. Locklear to Larry Wayne Locklear's house in her Honda Civic. At that location, Mr. Locklear purchased thirteen

---

[1]In addition to acknowledging that he was a drug dealer, Mr. Locklear was serving a federal sentence at the time of Defendant's trial and admitted that his federal sentence might be reduced based upon his cooperation with the State in connection with Defendant's trial.

packages of marijuana that had each been compressed into the shape of an automobile license plate. Upon returning to Fayetteville, Mr. Locklear discovered that each package of marijuana weighed less than the agreed-upon amount. In light of that discovery, Ms. Cahoon drove Mr. Locklear back to Larry Wayne Locklear's house in order to obtain the additional amount of marijuana to which Mr. Locklear was entitled.

As Ms. Cahoon and Mr. Locklear approached Larry Wayne Locklear's residence, they noticed that they were being followed by an older, brown two-door Cadillac. Mr. Locklear had never seen the two-door Cadillac before that night. While Ms. Cahoon pulled into the driveway at Larry Wayne Locklear's house, the Cadillac continued down the road, turned around, and slowly drove by Larry Wayne Locklear's house a second time.

Ms. Cahoon waited in the car while Mr. Locklear went inside to get the additional marijuana from Larry Wayne Locklear. At approximately 11:55 p.m., Mr. Locklear returned to Ms. Cahoon's vehicle carrying the additional marijuana that he had obtained from Larry Wayne Locklear in a plastic trash bag. Upon entering Ms. Cahoon's Honda, Mr. Locklear placed the bag of marijuana on the floorboard. As the return trip to Fayetteville began, Mr. Locklear noticed the brown Cadillac that had followed them

earlier parked beside the road at an intersection.  Mr. Locklear could not tell how many people were in the Cadillac.

At the time that Ms. Cahoon's Honda passed the Cadillac, the Cadillac pulled in behind them.  After accelerating rapidly, the Cadillac pulled alongside Ms. Cahoon's Honda.  As Ms. Cahoon asked, "What's going on, baby?," Mr. Locklear observed that someone was hanging out of the Cadillac's passenger side and saw that person fire three shots at the Honda using a rifle.  After the shots were fired, Ms. Cahoon's head hit the steering wheel. Mr. Locklear threw up his arms in an attempt to protect himself and put the back of his car seat all the way down so that his head was below the level of the window.

As the Honda slowed to a stop with its engine still running, the Cadillac cut in front of the Honda.  Ms. Cahoon was motionless and slumped over the steering wheel.  According to Mr. Locklear, two men, one of whom wore a hoodie and carried a shotgun or rifle and the other of whom wore a long white shirt and carried a black gun, emerged from the Cadillac.  Mr. Locklear identified Defendant, whom he had previously seen, as the man in the white shirt.[2]  After the man with the hoodie went to the passenger's side of the Honda and said, "Give it up, you M-F'er," Mr. Locklear got out of the Honda, crawled around to

---

[2]Mr. Locklear initially described the individual in the white shirt as African American.

the rear of the vehicle, and crouched behind the passenger side corner. Upon hearing two guns fire repeatedly into the Honda, Mr. Locklear threw up his hands and yelled that the occupants of the Cadillac should not kill him. However, Mr. Locklear did not think that the assailants could see him or hear him over the sound of the gunfire. As a result, Mr. Locklear ran across the road and jumped into a drainage ditch full of water and trash that ran alongside the road.

After he surfaced, Mr. Locklear heard more gunshots and saw vehicle lights approaching from the direction of Fayetteville. Once the man in the white shirt had reached into the passenger door of the Honda and grabbed the bag of marijuana from the floorboard, the two men reentered the passenger side of the Cadillac, which drove off in the direction of Fayetteville. An examination of the scene indicated that at least ten shots were fired into the Honda and that a shotgun, a rifle, and two nine millimeter firearms were used during the shooting.

Although Mr. Locklear tried to flag down the approaching car after getting out of the drainage ditch, the vehicle swerved around him without stopping. As he began running to Larry Wayne Locklear's house to get help, Mr. Locklear tried without success

to flag down a second passing car.[3]  After Mr. Locklear reached Larry Wayne Locklear's house, Larry Wayne Locklear's girlfriend, India Rose Locklear, called 911.

About a week after the shooting, Mr. Locklear received a voicemail from a person who identified himself as Isaac in which the caller denied having had anything to do with the shooting. Mr. Locklear subsequently identified a man named Isaac Nesby as the man in the hoodie after viewing a photographic lineup. Although Mr. Nesby was arrested and charged with involvement in the shootings, the charges against him were subsequently dismissed.  At trial, Mr. Locklear testified that Mr. Nesby's nephew, Decario Whitfield, who allegedly resembled Mr. Nesby in appearance, was actually the man wearing the hoodie at the time of the shootings.  After being charged with the murder of Ms. Cahoon along with Defendant, Kenryn McMillian, and Cheyenne Woods, Mr. Whitfield was allowed to plead guilty to conspiracy to commit robbery with a dangerous weapon and testified on behalf of the State.[4]

---

[3]Connie Cummings, who drove one of the cars that travelled past the scene of the shooting, testified that she saw Mr. Locklear jump out of the ditch and try to wave her down, that she saw Kenryn McMillian and another dark-skinned person at the scene, and that, rather than stopping to render assistance, she swerved around Mr. Locklear and kept going.

[4]Mr. Whitfield initially refused to make a statement to investigating officers and only provided the account reflected

Mr. Whitfield testified that, on 31 March 2008, he accompanied his uncle, Mr. Nesby, to the home of Mr. Woods' mother so that Mr. Nesby could purchase a Cadillac. At the time of their arrival at the residence of Mr. Woods' mother, Defendant, Mr. Woods, and Mr. McMillian were present. After Mr. Whitfield asked Mr. Nesby if he could borrow the Cadillac to go get something to eat, Mr. Whitfield, Mr. McMillian, Mr. Woods, and Defendant left the premises in the Cadillac with Mr. McMillian driving, Defendant riding in the front passenger seat, Mr. Whitfield riding in the rear passenger-side seat, and Mr. Woods riding in the rear driver's-side seat. At the time of their departure, Mr. Whitfield, who was wearing a hoodie, had a black shotgun with a pistol grip; Defendant had a black automatic rifle; and Mr. Woods had a nine millimeter handgun.

After traveling for some distance down a road with which Mr. Whitfield was unfamiliar, Mr. McMillian turned around and drove past a particular trailer at a very slow rate of speed. Upon leaving that location, Mr. McMillian drove through an intersection, stopped on the side of the road, and remained there for some period of time. Once a vehicle that had been at the trailer which they had previously observed passed through the intersection, Mr. McMillian began following it.

in his trial testimony after having reached a plea agreement with the prosecution.

Although Mr. McMillian flashed the Cadillac's headlights at the other vehicle in an attempt to get it to stop, the other vehicle sped up instead. After pulling up alongside the other vehicle, Mr. McMillian stated that the group should stop the car by shooting out its tires. As he hung outside the front passenger side window, Defendant fired two shots at the car with the rifle. The other car gradually came to a stop after the firing of the second shot, allowing Mr. McMillian to pull the Cadillac in front of the other car.

As soon as both cars had stopped, the occupants of the Cadillac got out of that vehicle. Once the group had exited the Cadillac, Mr. Whitfield fired the shotgun over the roof of the other car. The nine millimeter handgun held by Mr. Woods was fired at some point during this event as well.

After Mr. Whitfield fired the shotgun, the passenger door of the other car opened and a male occupant stepped out. Although Mr. Whitfield fired again, the man made it to the rear of the other car, at which point he was no longer visible. As Mr. Whitfield walked to the other side of the car in order to look for the man, he could see through the front windshield that another occupant of the car had been shot. In the meantime, Defendant went to the passenger side of the other vehicle and retrieved a plastic bag full of drugs.

As the occupants of the Cadillac saw other cars approaching, they reentered the Cadillac and drove away for the purpose of disposing of their weapons, eventually reaching a dirt road where Mr. Woods disposed of the rifle and the handgun. The group then went to the residence of Mr. Woods' mother, where they left the shotgun, retrieved Defendant's van, took the Cadillac and the van to another dirt road, and set fire to the Cadillac. After burning the Cadillac, the group left in Defendant's van and dropped Mr. Whitfield, who took a portion of the stolen marijuana with him, off at his father's house.

On 3 April 2008, Agent Ricky Williams of the Robeson County Sheriff's Department was part of a team assigned to conduct surveillance at the Motel 6 in Lumberton in an effort to locate a gray Chevrolet Astro van and Defendant, Mr. Woods, and Mr. McMillian. During the surveillance process, Agent Williams observed Defendant emerge from a room in the Motel 6, put some shoes into the gray van, and return to the room. When the van subsequently left the motel, Agent Williams followed the vehicle and eventually stopped it for driving left of center.

At the time of this traffic stop, a woman was driving the van, with Defendant and Mr. Woods occupying the rear seat. In the process of conducting a consent search of the van, Agent Williams discovered three packages of marijuana in a black trash

bag in the back of the van. The packages of marijuana that Agent Williams found in the van were compressed into the shape of license plates, a configuration which Agent Williams had never seen before.

On 24 April 2008, Sergeant Lee Wilkerson of the Parkton Police Department stopped a vehicle in which Mr. Woods was a passenger. After giving Sergeant Wilkerson a false name and date of birth, Mr. Woods fled on foot after being asked to step out of the vehicle. Shotgun shells recovered at the scene of the shooting had been fired from a shotgun which Sergeant Wilkerson seized during a search of the vehicle in which Mr. Woods was riding.

Mr. Locklear sustained gunshot wounds in the upper left arm, the back of his right forearm, and his upper right shoulder at the time of the shooting. Ms. Cahoon was pronounced dead at the scene of the shooting as a result of her injuries. According to Dr. John Butts, Ms. Cahoon died from a high-velocity gunshot wound to the head, with the nature of Ms. Cahoon's injuries being more consistent with those typically inflicted by a rifle compared with those inflicted by a handgun.

### B. Procedural History

On 23 May 2008, a warrant for arrest charging Defendant with murder, shooting into an occupied vehicle, and robbery with

a dangerous weapon was issued. On 16 February 2009, the Robeson County grand jury returned a bill of indictment charging Defendant with first degree murder, shooting into an occupied vehicle, and robbery with a dangerous weapon. The charges against Defendant, along with similar charges that had been lodged against Mr. McMillian and Mr. Woods, came on for trial before the trial court and a jury at the 25 June 2012 criminal session of Robeson County Superior Court. On 12 July 2012, the jury returned a verdict convicting Defendant of robbery with a dangerous weapon, discharging a firearm into occupied property, and first degree murder on the basis of the felony murder rule using shooting into an occupied vehicle as the predicate felony and on the basis of lying in wait.[5] At the conclusion of the ensuing sentencing hearing, the trial court arrested judgment on the discharging a firearm into an occupied vehicle conviction, entered judgment sentencing Defendant to 51 to 71 months imprisonment based upon his conviction for robbery with a dangerous weapon, and entered judgment sentencing Defendant to a consecutive term of life imprisonment without parole based upon his conviction for first degree murder. Defendant noted an appeal to this Court from the trial court's judgments.

---

[5]The jury did not find Defendant guilty of first degree murder based on malice, premeditation, and deliberation or the felony murder rule using robbery with a dangerous weapon as the predicate felony.

## II. Substantive Legal Analysis

### A. Use of Restraints at Trial

In his initial challenge to the trial court's judgments, Defendant argues that the trial court, by requiring Defendant to wear a "stun vest" underneath his clothing and operated by a uniformed officer seated on the row behind Defendant during the trial violated, N.C. Gen. Stat. § 15A-1031 and his state and federal constitutional rights to a fair trial. Although Defendant is correct in noting that the trial court had an inadequate basis for requiring Defendant to wear the "stun vest" and that the trial court failed to comply with the requirements of N.C. Gen. Stat. § 15A-1031 at the time that the restraints in question were approved, we conclude that the trial court's errors were harmless beyond a reasonable doubt. As a result, Defendant is not entitled to relief from the trial court's judgments based upon this argument.

### 1. Applicable Legal Principles

As a general proposition, "a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary instances." *State v. Tolley*, 290 N.C. 349, 365, 226 S.E.2d 353, 366 (1976). However, the trial court "may order a defendant [] subjected to physical restraint in the courtroom when the judge finds the restraint to be reasonably

necessary to maintain order, prevent the defendant's escape, or provide for the safety of persons." N.C. Gen. Stat. § 15A-1031 (2013). "'What is forbidden - by the due process and fair trial guarantees of the Fourteenth Amendment to the United States Constitution and Art. I, Sec. 19 of the North Carolina Constitution - is physical restraint that improperly deprives a defendant of a fair trial.'" *State v. Simpson*, 153 N.C. App. 807, 809, 571 S.E.2d 274, 276 (2002) (quoting *State v. Wright*, 82 N.C. App. 450, 451, 346 S.E.2d 510, 511 (1986)). When a challenge to a trial court's decision to restrain a criminal defendant is advanced before an appellate court, "the test on appeal is whether, under all of the circumstances, the trial court abused its discretion." *Tolley*, 290 N.C. at 369, 226 S.E.2d at 369.

According to *Tolley* and N.C. Gen. Stat. § 15A-1031, a trial judge must follow the proper procedures in determining that a defendant should remain shackled or be otherwise restrained during trial. *State v. Lee*, __ N.C. App. __, __, 720 S.E.2d 884, 890, *disc. review improvidently granted*, 366 N.C. 329, 734 S.E.2d 571 (2012). As part of this process, the trial court must enunciate, in the presence of the defendant and out of the presence of the jury, the particular reasons underlying the decision to place the defendant under restraint and afford the

defendant an opportunity to object or otherwise be heard. *Tolley*, 290 N.C. at 368, 226 S.E.2d at 368; N.C. Gen. Stat. § 15A-1031(1) and (2). In addition, unless the defendant expressly requests to the contrary, the trial court must instruct the jurors to refrain from considering the existence of the restraint in weighing the evidence or determining the issue of the defendant's guilt. N.C. Gen. Stat. § 15A-1031(3). If the defendant objects to the use of restraints, the trial judge should conduct a full evidentiary hearing and make formal findings of fact. *Tolley*, 290 N.C. at 368, 226 S.E.2d at 368; N.C. Gen. Stat. § 15A-1031. In considering whether a defendant should be restrained, the trial court should consider, among other things:

> [T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.

*Tolley*, 290 N.C. at 368, 226 S.E.2d at 368. As this Court has emphasized, "[s]hould the trial judge, in his sound discretion, decide shackling is a necessary means for a safe and orderly

trial in his or her courtroom, the determination *must* be supported by adequate findings." *State v. Jackson*, 162 N.C. App. 695, 700, 592 S.E.2d 575, 578 (2004) (emphasis added).

## 2. "Stun Vests"

As we have already noted, the trial court ordered Defendant and his co-defendants to wear "stun vests" underneath their clothing during trial. The "stun vests" in question were operated by uniformed officers, who sat behind each defendant and were instructed to activate the vests only in the event that such an action was necessary to prevent one or more of the restrained individuals from engaging in violent outbursts or attacking someone. After the trial court gave Defendant the opportunity to object to the use of the "stun vest," Defendant argued that he had not exhibited any behavior which justified the imposition of this sort of restraint, that there were no extraordinary circumstances which justified the imposition of the proposed restraint, and that the placement of uniformed officers behind Defendant created a presumption of dangerousness and guilt. On the other hand, the State argued that the recommendation that the "stun vests" be used had been made by jail personnel on the basis of a perception that the use of these devices was necessary to preserve courtroom safety in light of certain unspecified incidents which had taken place in

the jail involving "defendants." After hearing the arguments of counsel, the trial court, without making any findings of fact or providing any explanation for its decision, approved the use of the "stun vests" and the seating of the uniformed officers behind the table at which Defendant and his co-defendants were seated. No similar law enforcement presence was apparent anywhere else in the courtroom.

As an initial matter, we note that nothing presented to the trial court provided any particular basis for restraining Defendant. Although the unsworn information presented to the trial court suggested that Mr. McMillian had posed significant problems for the jail staff during his time in pretrial detention and that "defendants" had created certain unspecified problems in the jail, the record contains no suggestion that there was any basis for believing that Defendant posed any escape risk or threat to others of the type that has traditionally been utilized to justify the use of shackles or other restraints. As a result, given that Mr. McMillian's prior conduct does not justify placing Defendant under restraint; given that the fact that the jury could not see the "stun vest" which Defendant and his co-defendants were required to wear has no bearing on the extent to which the trial court's decision to restrain Defendant was erroneous, *Jackson*, 162 N.C. App. at 701,

592 S.E.2d at 579 (stating that the "obligation [to refrain from ordering that a defendant be shackled or otherwise restrained in the absence of compliance with applicable legal requirements] is not excused when attempts are made to conceal from the jury the fact that the defendant is shackled" on the theory that "the concerns that shackling interferes with the defendant's thought processes and communications with counsel, and affronts the dignity of the trial process, are not cured by mere concealment from the jury"); and given that the record developed before the trial court shows no additional support for placing Defendant under restraint other than a generalized expression of concern by the jail staff, *Lee*, __ N.C. App. at __, 720 S.E.2d at 891 (holding that "the trial court's sole reason for denying defendant's request to remove his shackles during trial was that defendant was financially unable to make bond and therefore required to remain in shackles pursuant to jail policy" and that "requiring defendant to remain in shackles during trial in the presence of the jury under these conditions is inherently prejudicial"), we conclude that the trial court lacked a sufficient basis to justify requiring Defendant to wear a "stun vest" during the trial.

In addition, the trial court failed to comply with the requirements of N.C. Gen. Stat. § 15A-1031 in deciding that

Defendant should be restrained. More specifically, the trial court did not provide any explanation for its decision to subject Defendant to the restraints in question or make findings of fact in support of its determination. Furthermore, the record contains no indication that the trial court ever instructed the jury to refrain from considering the fact that Defendant had been restrained in weighing the evidence or determining his guilt or ever obtained Defendant's approval of a decision to refrain from delivering such an instruction. Finally, even though Defendant objected to the restraints to which he was subjected, the trial court simply heard the argument of counsel concerning the validity of Defendant's objections to the use of the restraints in question and never heard any evidence directed toward the criteria enunciated in *Tolley*.[6] As a result, the trial court failed to comply with the requirements of N.C. Gen. Stat. § 15A-1031 in the course of determining that Defendant should be required to wear a "stun vest" during the trial.

---

[6]Admittedly, the record does not reflect that Defendant ever requested that such a hearing be held. However, we need not determine whether Defendant's failure to request that such a hearing be held excuses the fact that the trial court did not hear evidence concerning the appropriateness of requiring Defendant and his co-defendants to wear "stun vests" given our determination that any errors committed by the trial court were harmless beyond a reasonable doubt.

Neither an erroneous decision to shackle or otherwise restrain a defendant nor a violation of N.C. Gen. Stat. § 15A-1031 requires us to award a new trial or other appellate relief in the absence of a showing of prejudice. *Simpson*, 153 N.C. App. at 808, 571 S.E.2d at 275 (stating that, "[w]hile we agree with defendant that the trial court did not fully comply with the requirements of [N.C. Gen. Stat.] § 15A-1031, he has not shown prejudice requiring a new trial"); *Wright*, 82 N.C. App. at 452, 346 S.E.2d at 511 (stating that "new trials are granted only for errors that are prejudicial"). In determining whether the trial court's decision to require Defendant to wear a "stun vest" and its failure to comply with N.C. Gen. Stat. § 15A-1031 necessitate an award of appellate relief, we will attempt to ascertain whether the trial court's errors were harmless beyond a reasonable doubt. *Wright*, 82 N.C. App. at 452, 346 S.E.2d at 511 (evaluating whether a defendant was entitled to a new trial as the result of an allegedly erroneous decision to restrain the defendant utilizing the "harmless beyond a reasonable doubt" standard enunciated in N.C. Gen. Stat. § 15A-1443(b)). We are unable to avoid the conclusion that the trial court's errors in this case were harmless beyond a reasonable doubt.

A careful review of the record provides no indication that the jury was affected by, or even aware of, the fact that

Defendant was wearing the "stun vest." As this Court has previously noted, "where the record fails to disclose that a defendant's shackles were visible to the jury, 'the risk is negligible that the restraint undermined the dignity of the trial process or created prejudice in the minds of the jurors,' and the defendant will not be entitled to a new trial on that basis." *Simpson*, 153 N.C. App. at 809-10, 571 S.E.2d at 276 (quoting *State v. Holmes*, 355 N.C. 719, 729, 565 S.E.2d 154, 163, *cert. denied*, 537 U.S. 1010, 123 S. Ct. 478, 154 L. Ed. 2d 412 (2002)). Although Defendant argues that he was prejudiced because the trial court required him to wear the "stun vest" on the theory that the vest "interfered with [his] thought processes, his ability to stay focused on the proceedings, and the ease of his communication with counsel," the record contains no support for this assertion other than a reference to the fact that the vests were uncomfortable and distracting.

The compelling evidence of Defendant's guilt provides additional support for our conclusion that the trial court's errors were harmless beyond a reasonable doubt. *See State v. Thomas*, 134 N.C. App. 560, 570, 518 S.E.2d 222, 229 (finding no prejudice when Defendant appeared before the jury in shackles due to the overwhelming evidence of the defendant's guilt), *disc. review denied*, 351 N.C. 119, 541 S.E.2d 468 (1999); *Lee*,

__ N.C. App. at __, 720 S.E.2d 884, 891-92 (concluding that, even though the trial court failed to follow the statutorily required procedures or to consider factors relevant to a restraint-related decision, this Court "fail[ed] to see how defendant's shackling contributed to his convictions" in light of the overwhelming evidence of his guilt). As even a cursory perusal of the record shows, Defendant was identified as one of the principal perpetrators of the assault on Ms. Cahoon and Mr. Locklear by the surviving victim. In addition, one of the participants in the commission of these crimes described his participation, and that of Defendant, in the murder, shooting, and robbery in chilling detail. Although there were admittedly grounds for challenging the testimony of these witnesses based on their criminal histories and interests in the proceeding, the record provides no basis for an inference that Mr. Locklear and Mr. Whitfield had colluded to develop their essentially identical accounts of Defendant's involvement in the shooting and robbery. Finally, what appears to have been the stolen marijuana was seized from Defendant's van, providing an even stronger justification for a finding of guilt. Thus, given that the jury did not ever learn that Defendant was wearing a "stun vest" and the overwhelming evidence of Defendant's guilt, we conclude beyond a reasonable doubt that the jury would not have

reached a different verdict if Defendant had not been forced to wear a "stun vest" during his trial.

### 3. Uniformed Security Personnel

Secondly, Defendant argues that, even if the jury was unable to see the "stun vests" which he and his co-defendants were required to wear, its members could see the uniformed officers who were seated directly behind them and that the presence of these uniformed officers suggested to the jury that they were dangerous and were, for that reason, probably guilty in violation of his right to receive a fair trial. We do not believe that Defendant's argument is meritorious.

In *Holbrook v. Flynn*, the United States Supreme Court considered the extent to which the presence of identifiable security personnel during a defendant's trial deprived the defendant of a fair trial and concluded that a case-by-case approach should be utilized in examining such issues. *Holbrook v. Flynn*, 475 U.S. 560, 569, 106 S. Ct. 1340, 1346, 89 L. Ed. 2d 525, 535 (1986) (cited in *State v. Maness*, 363 N.C. 261, 281, 677 S.E.2d 796, 809 (2009), *cert denied*, 559 U.S. 1052, 130 S. Ct. 2349, 176 L. Ed. 2d 568 (2010)). In *Holbrook*, four uniformed state troopers sat in the first row behind the defendants at trial. *Id*. at 562-63, 106 S. Ct. at 1342-43, 89 L. Ed. 2d at 530. In response to an argument that this

substantial law enforcement presence deprived the defendants of a fair trial, *Id*. at 570, 106 S. Ct. at 1346, 89 L. Ed. 2d at 535, the Supreme Court "simply [could not] find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section." *Id*. at 571, 106 S. Ct. at 1347, 89 L. Ed. 2d at 536. According to the Supreme Court, even if the members of the jury been aware that the troopers had been deployed for security-related purposes and that the presence of this many security officers was not consistent with routine practice, there was no reason to believe that the troopers' presence tended to brand the defendants in the jury's eyes "with an unmistakable mark of guilt" or that the jury was likely to treat the presence of these troopers as anything other than the level of security necessary to permit the trial to proceed. *Id*. As a result, the United States Supreme Court declined to provide any relief on appeal.

We are unable to distinguish the facts of this case from those present in *Holbrook* in any meaningful way. As in *Holbrook*, uniformed officers sat in the row behind the defendants during the trial. Although the officers in question were positioned near Defendant and his co-defendants for the purpose of operating the "stun vests," nothing in the record in

any way tends to indicate that the jurors knew that Defendant and his co-defendants were wearing "stun vests," much less that the officers were positioned as they were in order to operate such pieces of equipment. During its preliminary remarks, the trial court told the jury that "[w]e also have three other bailiffs sitting in the courtroom" and that "their position in the courtroom is to separate the audience, the folks in the audience from the folks sitting at the defense table." In light of our belief that the jury was unlikely to view the presence and positioning of the officers "as a sign of anything other than a normal official concern for the safety and order of the proceedings," *Holbrook* at 571, 106 S. Ct. at 1347, 89 L. Ed. 2d at 536, we cannot agree with Defendant that the presence of the officers deprived him of a fair trial. As a result, the trial court did not err by allowing the officers operating the "stun vests" to sit in the row behind Defendant at trial. Thus, neither of Defendant's challenges to the security measures approved by the trial court for use during Defendant's trial have merit.

## B. Flight Instruction

Finally, Defendant contends that the trial court erred by instructing the jury that it was entitled to consider Defendant's flight as evidence that he was conscious of his own

guilt.  In support of this contention, Defendant argues that the record evidence did not support an inference that Defendant fled for the purpose of avoiding apprehension.  We do not find Defendant's contention persuasive.

## 1. Standard of Review

"[Arguments] challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009).  "'Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal."  *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (quoting *In re Greens of Pine Glen, Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)). "[A] trial judge should not give instructions to the jury which are not supported by the evidence produced at the trial."  *State v. Cameron,* 284 N.C. 165, 171, 200 S.E.2d 186, 191 (1973), *cert. denied*, 418 U.S. 905, 94 S. Ct. 3195, 41 L.Ed.2d 1153 (1974). "[A]n error in jury instructions is prejudicial and requires a new trial only if 'there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises.'"  *State v. Castaneda*, 196 N.C. App. 109, 116, 674

S.E.2d 707, 712 (2009) (quoting N.C. Gen. Stat. § 15A-1443(a) (2007)).

## 2. Appropriateness of Flight Instruction

"Evidence of a defendant's flight following the commission of a crime may properly be considered by a jury as evidence of guilt or consciousness of guilt." *State v. King*, 343 N.C. 29, 38, 468 S.E.2d 232, 238 (1996). However, "a trial court may not instruct a jury on defendant's flight unless 'there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged.'" *State v. Levan*, 326 N.C. 155, 164-65, 388 S.E.2d 429, 433-34 (1990) (quoting *State v. Irick*, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977)). "Mere evidence that defendant left the scene of the crime is not enough to support an instruction on flight;" instead, "[t]here must also be some evidence that defendant took steps to avoid apprehension," *State v. Thompson*, 328 N.C. 477, 490, 402 S.E.2d 386, 392 (1991), with the record evidence to be considered in the light most favorable to the State in making this determination. *See State v. Grooms*, 353 N.C. 50, 80, 540 S.E.2d 713, 732 (2000) (holding that "[t]hese facts, taken in the light most favorable to the State, permit an inference that defendant had a consciousness of guilt and took steps, albeit

unsuccessful, to avoid apprehension"), *cert. denied*, 534 U.S. 838, 122 S. Ct. 93, 151 L. Ed. 2d 54 (2001).

The present record contains ample evidentiary support for the trial court's flight instruction. After the shooting and robbery, Defendant and his co-defendants left the scene after seeing the headlights of an approaching vehicle, drove down a dirt road in order to dispose of certain of their weapons, and set fire to the Cadillac in which they had been riding. Defendant and his co-defendants were observed and apprehended three days later in another municipality. This evidence, when taken in the light most favorable to the State, is more than sufficient to justify the delivery of the trial court's flight instruction. *See State v. Lloyd*, 354 N.C. 76, 119, 552 S.E.2d 596, 626 (2001) (holding that the trial court did not err by delivering a flight instruction given the presence of evidence tending to show that the defendant left the crime scene hurriedly in his car without providing medical assistance to the victim); *State v. Reeves*, 343 N.C. 111, 113, 468 S.E.2d 53, 55 (1996) (holding that evidence tending to show that the defendant, after shooting the victim, ran from the scene, got into a nearby car, and drove away was sufficient to support the delivery of a flight instruction). The fact that, as Defendant argues, the destruction of evidence is not equivalent to flight

to avoid apprehension or that the record does not indicate that Defendant personally engaged in the destruction of evidence would not support a decision to reach a different result given that the record clearly reflects that Defendant left the area in which the shooting and robbery was committed and that Defendant was present at and aware of the steps that were taken to conceal the involvement of the perpetrators in the commission of these crimes. As a result, when taken in the light most favorable to the State, the record contains ample evidence tending to show that Defendant's actions following the shooting and robbery did, in fact, reflect flight undertaken as part of an effort to "avoid apprehension." *Thompson*, 328 N.C. at 490, 402 S.E.2d at 392.

In seeking to persuade us to reach a different result, Defendant places principal reliance on two prior decisions by this Court and the Supreme Court. In one of those decisions, we found that the trial court erred by instructing the jury concerning the issue of the defendant's flight in a situation in which the evidence showed that the defendant left the crime scene with his accomplices, drove to the home of one of his accomplices, and later was driven to his girlfriend's house. *State v. Holland*, 161 N.C. App. 326, 330, 588 S.E.2d 32, 36 (2003). In holding that the delivery of a flight instruction

was error in light of these facts, this Court held that "visiting a friend at [his or her] residence is not an act that, by itself, raises a reasonable inference that defendant was attempting to avoid apprehension." *Id*. Needless to say, the record before us in this case reveals that Defendant did a great deal more than merely "visit a friend at [his] residence." Instead, Defendant and his co-defendants disposed of the weapons, burned the car used in the commission of the offense, and went to another locality.

In the other decision upon which Defendant relies, the Supreme Court held that the delivery of a flight instruction constituted error given that the only evidence cited in support of that instruction was testimony by a law enforcement officer that he had ridden around the defendant's neighborhood for several days in an attempt to locate the defendant without ever going to his residence or making any inquiry about his whereabouts. *State v. Lee*, 287 N.C. 536, 539, 215 S.E.2d 146, 148-49 (1975). The record before us in this case demonstrates substantially more than that a law enforcement officer unsuccessfully sought to locate Defendant. Instead, the evidence that Defendant attempted to flee following the commission of the shooting and robbery for the purpose of attempting to avoid apprehension is considerably stronger than

the flight-related evidence deemed insufficient in *Lee*. As a result, given that the record contains "some evidence . . . reasonably supporting the theory that defendant fled after commission of the crime charged," *Levan*, 326 N.C. at 164-65, 388 S.E.2d at 434 (quotation marks and citations omitted), the trial court did not err by instructing the jury concerning the purposes for which they were entitled to consider evidence of Defendant's flight.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Defendant's challenges to the trial court's judgments have merit. As a result, the trial court's judgments should, and hereby do, remain undisturbed.

NO PREJUDICIAL ERROR.

Judges McGEE and STEELMAN concur.

Report per Rule 30(e).